## Case No. 29.

### The ACORN.

[2 Abb. U. S. 434;[1] 12 Int. Rev. Rec. 113; 2 Chi. Leg. News, 413; 5 Amer. Law Rev. 563.]

District Court, E. D. Michigan. June Term, 1870.

FORFEITURE—REGISTRY OF VESSELS — RECORD OF NATURALIZATION.

1. The act of April 25, 1866, (14 Stat. 40,)—directing the secretary of the treasury to issue enrollment and license to certain vessels therein named,—is mandatory in its terms; and an oath, in accordance with the provisions of section 4 of the act of December 31, 1792, (1 Stat. 287,) to obtain enrollment and license under the former act, is unnecessary.

2. An oath thus made to procure enrollment is extra-judicial, and of no effect; and though the oath was false, the provisions of law declaring a forfeiture in such cases have no application.

3. Where, in a libel for forfeiture for alleged violation of the registry laws, the claimant is charged with not being the owner of the vessel, and all the evidence relating to the ownership is introduced by the government, which tends to prove rather than disprove such ownership on the part of the claimant, such evidence must be taken as a whole; and the claimant need not introduce evidence upon the subject, to establish his ownership.

4. In a libel for such cause, where the claimant is charged with not being a citizen of the United States at the time of the enrollment, and, in order to refute such charge, he introduces in evidence an exemplified copy of the record of his naturalization under the United States laws in a court of competent jurisdiction, he need not also prove the preliminary proceedings necessary to give the naturalizing court jurisdiction.

[Cited in Re Coleman, Case No. 2,980.]

5. The order of a court of competent jurisdiction, admitting an alien to citizenship, is in the nature of a judgment, and, in the absence of fraud, is conclusive as to the question of the requisite length of residence of the naturalized citizen in the United States.

[Cited in McDermott v. Copeland, 9 Fed. Rep. 537; Charles Green's Sons v. Salas, 31 Fed. Rep. 108.]

6. The distinction between cases in which judgments may and those in which they may not be impeached collaterally, may be stated thus: They may be impeached by facts involving fraud or collusion, but which were not before the court or involved in the issue or matter upon which the judgment was rendered. They may not be impeached for any facts, whether involving fraud or collusion or not, or even perjury, which were necessarily before the court and passed upon.

In admiralty. Hearing on a libel of information. This was a libel of information and seizure for forfeiture for alleged violation of the registry laws. The libel alleged as cause for forfeiture, that the oath taken by David Muir, the claimant, to obtain enrollment and license of the bark, was false in the following particulars:

1. That at the time of taking the oath the said David Muir was not a citizen of the United States, as in said oath alleged. 2.

*[Reported by Benjamin Vaughn Abbott, Esq., and here reprinted by permission.]

That he was not the true and only owner of the vessel. 3. That there were subjects of a foreign prince or State, directly or indirectly, by way of trust, confidence, or otherwise, interested in the vessel, or in the profits or issues thereof.

The libel in the second article also alleged the fraudulent use of an enrollment and license for the bark, to which she was not entitled.

The claim, answer, and exceptions of David Muir, 1st, alleged his ownership of the vessel; 2nd, excepted to the jurisdiction of the court; but as this ground of defense was abandoned at the hearing as untenable, no notice was taken of it by the court; 3rd, admitted that claimant took the oath as alleged in the libel, but denied its falsity, and alleged the truth of the statements contained in it; 4th, denied the fraudulent use of an enrollment and license, as alleged in the second article of the libel; also contested the forfeiture, and claimed costs. The proofs taken, and the facts of the case, sufficiently appear in the opinion of the court.

A. Russell, for the United States.

Newberry, Pond & Brown, for claimant.

LONGYEAR, District Judge. By an act of congress approved April 25, 1866, (14 Stat. 40,) the secretary of the treasury was directed to issue an American enrollment and license to the bark Acorn, among a large number of other vessels named in said act, and accordingly the bark was enrolled and licensed at Chicago, July 11, 1866. The enrollment purports on its face to be in pursuance of the act of April 25, 1866, and also of the general acts of congress providing for the enrollment and license of ships or vessels, and for the regulation of the foreign and coasting trade on the northern, northeastern, and northwestern frontiers of the United States.

The forfeiture is claimed in this case under section 4 of the act of December 31, 1792, (1 Stat. 287,) the provisions of which, as to forfeiture, have been held by the supreme court, in the case of The Mohawk, 3 Wall. [70 U. S.] 566, to apply to enrolled and licensed as well as to registered vessels. It is contended, however, on behalf of the claimant, that the act of April 25, 1866, directing the secretary of the treasury to issue an enrollment and license, is mandatory, and that under it section 4 of the act of 1792 has no application; that the questions of citizenship of the owner and the ownership of the vessel do not arise, and that no oath could be lawfully required as a preliminary requisite, as required by said section 4, and that therefore the oath which was made to procure the enrollment, as alleged, was extra-judicial, and no forfeiture could be claimed, even if the same was false.

First, then, as to the effect of the act of

April 25, 1866. It is true, as claimed, that the act is mandatory in its terms. The language is: "The secretary of the treasury is hereby directed to issue American registers, . . . or enrollment and license, to the following named vessels, that is to say;" and then follows a long list of vessels, including the said bark Acorn. No conditions are imposed, and no preliminary steps are prescribed by the act. The attention of the court is challenged to the fact that in other acts of congress, for a like purpose, conditions are imposed, and preliminary steps are prescribed, as an evidence that in this instance congress intended the enrollment and license to issue absolutely and immediately.

Looking at these acts alone, the court would have no doubt that the construction claimed is the correct one. But in view of the general laws of congress upon the subject of registry, enrollment, and license, and of the objects and purposes to be accomplished thereby, viz: to build up and foster a commerce purely American, and to protect the revenue, serious doubts were suggested, and the court felt it an imperative duty to seek for some other construction of the act than that contended for, and more in keeping with the object and purpose of the registry laws. Thirty-one vessels in all are covered by the act, and it is difficult to conceive that congress could have intended so important and dangerous an innovation upon its established system as it would be to give the act the effect suggested, and the court would not do so, only as it might feel compelled to, by force of the clear and unmistakable meaning of the words of the act.

As my brother, Judge Withey, of the western district, has a case before him, U. S. v. The Advance, [Case No. 14,425,] precisely like this one, and was therefore directly interested in a correct decision of the questions of law arising in this case, I suggested to him my doubts upon this question, and after consultation with him, and mature deliberation, I see no escape from the conclusion that the act, by its own force, admits the vessels named in it to registry, or enrollment and license, peremptorily, and without any prerequisites or conditions whatever. After turning the question over and over, and viewing it on all sides and in all aspects, I have found myself unable to come to any other conclusion at all satisfactory to myself, without the necessity of interpolating into the act words of material import, which of course the court cannot do.

The act is mandatory in its terms. "The secretary of the treasury is hereby directed to issue American registers, . . . or enrollment and license," &c. Now, in order to hold that the requisites and conditions prescribed by the general laws must exist and be complied with before the secretary of the treasury can be called upon to obey the mandate, it is necessary to interpolate an entirely new element into the act; because the act is absolute, unconditional, and immediate in its operation and effect, and to hold as above indicated, would make it conditional and contingent, and would postpone its operation until other acts, not mentioned or referred to in terms or by necessary implication, have been complied with. Foreign vessels cannot be registered or enrolled and licensed under the general laws, but there can be no doubt that congress has the power, by special act, to nationalize such vessels, and confer upon them all the rights of registry, and enrollment and license, independent of the general laws. In the case of The Acorn, and of all the other thirty-one vessels named in the act of 1866, except three which are described as "Canadian built," no reason whatever is assigned, or can be deduced from its language or recitals, why the act was necessary, or why it was passed. We may presume that it was to cure or remove some disability or disabilities under which the respective vessels labored, and on account of which they could not be registered, or enrolled and licensed under the general laws. But if we are to resort to presumptions, we must presume that all disabilities were intended to be cured or removed, where none are specified. The act is plain, direct, positive, and peremptory in its language. There is no ambiguity in its provisions, nor room for construction. It is not based upon any requisite, qualification, or condition, or upon any want of them, relating to the vessel, its owner, master, or persons interested, at least so far as The Acorn is concerned, but is independent and regardless of all requisites, qualifications, or conditions. It is a simple command to an officer of the government to do a certain thing. Now, to say that he need not do the thing commanded, or only in case certain requisites and conditions exist and are complied with, among which is the oath to obtain enrollment and license here in question, is clearly to interpolate into the act what is not there in terms, and what cannot be inferred from the language used, by any fair or satisfactory construction of it. I hold, therefore, that no oath to obtain enrollment and license was necessary in this case, and hence that the oath which was made, and upon the alleged falsity of which a forfeiture is predicated, was extra-judicial, void, and of no effect. The provisions of law, therefore, declaring a forfeiture in such cases, have no application to this case. In this view of the first branch of the case, a consideration of the remaining points is unnecessary to its disposition. But in view of the importance of the questions involved, and in order to show that, regardless of the conclusions arrived at upon the first point, the result must have been the same, a consideration of the remaining points may not be unprofitable.

2. The second point involved, regards the ownership of the vessel. In cases of this sort the burden of proving that the ownership of the vessel and the persons interested in her are not as stated in the oath, is upon the United States. It was contended, however, that it is only necessary, in the first instance, for the United States to show probable cause, or a reasonable suspicion, and then the burden of proof changes. Without stopping now to inquire into the soundness of this position, we will proceed at once to examine the evidence upon this point.

The testimony of Austin A. Smith, and that of John S. Clark, taken by commission in Canada, on behalf of the United States, comprises all the proof in the case upon the question of ownership. Smith testifies that for three years previous to July 1, 1867, he was book-keeper and clerk, and a part of that time was employed by Muir Brothers, at Port Dalhousie, in Canada; that the business of the Muir Brothers, when he was in their employ, was ship-builders, ship-owners, and ship-chandlers. The witness then proceeds as follows: "Previous to the transfer of the vessels to Bryce Muir, one of the brothers, they owned the barks Alexander, Acorn, Advance, and Niagara, and the schooners Arctic, Ayr, and Asia. I do not recollect the date of the transfer, but believe it was somewhere during the year 1866. I was acquainted with the bark Acorn, and the Muir Brothers owned her up to the time of the transfer mentioned in last answer. Up to the said transfer all of the parties in the firm of Muir Brothers, consisting of Alexander Muir, Bryce Muir, William Muir, David Muir, and Archibald Muir, were interested in the profits of the said bark, and that they were solely so interested. The said partners, up to the time of the transfer to Bryce Muir, were equally interested in the said bark Acorn, and from the date of the said transfer, the said Bryce Muir was solely interested up to the time of another transfer thereof to David Muir; after the last transfer the said David Muir was solely interested. The Muir Brothers, before the transfer to Bryce Muir, were the owners of, and kept the books of the accounts of the said bark, and Bryce Muir afterwards up to the time of the transfer to David Muir, and after the transfer last mentioned, the said David Muir. The said firm had nothing to do with the profits after the said first transfer."

Clark testifies that he is a collector of canal tolls, (for what canal or where is not stated,) and then proceeds as follows: "During the year 1866, David Muir was the owner of the bark Acorn. I do not know who was or were interested in her profits in the said year. I never received any information from David Muir on the subject. My knowledge as to his ownership is derived from the fact that the said bark in passing through the canal that year was reported to me, and entered on my books as owned by the said David Muir."

This comprises all the proofs made or offered on either side as to the ownership of the vessel, and as to the persons interested in her profits. On this proof, it is contended, on behalf of the United States, that, having shown that the vessel once belonged in part to other owners, it is incumbent on the claimant to show that, at the time he made the oath for enrollment, the interest of the other owners had been sold and duly transferred to him; that the bills of sale, or other conveyance, by which the same was transferred, should have been produced, and that their nonproduction raises a presumption against the claimant's title, and that the statements of the witnesses, above quoted, as to transfer to and ownership by David Muir, are not competent to prove such transfers and ownership. Such would, undoubtedly, be the rule as applied to evidence offered by the claimant to prove his title after a case had been made against him, making such proof necessary. But it must be borne in mind that all the testimony there is in this case in regard to a transfer from the other former part-owners to Bryce Muir, and from him to David Muir, the claimant, is produced on behalf of the United States, and although it is somewhat indefinite as to time, it is as definite, direct, and positive, as the other portions of the same testimony tending to prove that other persons were once interested in the vessel. It is a part of the case for the government, as made by its proofs, and it cannot be rejected by any known rule of law. The testimony upon the subject of ownership, as above recited, must be taken as a whole, and being so taken, if it proves anything, it proves that David Muir was the sole owner, and was solely interested. To say the least of it, it fails to make out such a case as makes it incumbent upon the claimant to make any proof upon the question of ownership.

Therefore, the allegations of the libel that said David Muir, at the time of making the oath for enrollment "was not the true and only owner of the vessel," and that "there were subjects of a foreign prince or state, directly or indirectly, by way of trust, confidence, or otherwise interested in the said bark," &c., are not sustained.

3. As to the citizenship of the claimant David Muir. For the purpose of sustaining the allegation of the libel that David Muir was not a citizen of the United States, as alleged in his oath for enrollment, testimony was introduced on behalf of the United States, tending to show that for several years previous to the year 1866 (the year in which the vessel was enrolled), the said David Muir had resided in Canada, and was assessed and paid taxes there, and that he was registered as a voter there as late as the year 1863. To meet the case thus made

against him, the said David Muir introduced in evidence an exemplified copy of the record of his naturalization, under the laws of the United States, in the superior court of the city of Chicago, being a court of competent jurisdiction, January 27, 1866. This record was offered and admitted in evidence without objection, but on the final argument, counsel for the United States took the following exception to its sufficiency: That the preliminary proceedings necessary to give the naturalizing court jurisdiction, viz.: the petition, declaration of intention, and oath of allegiance, are not proven. It is recited in the record that such proceedings were had, but it is contended that such recitals are not evidence, but that the proceedings themselves should have been proven. It is doubtful whether this objection does not come too late, but even if in time, the weight of authority is decidedly against the position that such preliminary proceedings must be proven, and I see no reason for holding otherwise in this case. See Ritchie v. Putnam, 13 Wend. 524–526; Stark v. Chespeake Ins. Co., 7 Cranch, [11 U. S.] 420.

It is contended also on the part of the United States, that inasmuch as the order of naturalization could be made only on proof of continued residence in the United States for five years immediately preceding, it must in this case, in view of the evidence on behalf of the United States, above mentioned, have been made upon false testimony as to the fact of such residence. This presents the question—Is the order admitting an alien to citizenship conclusive as to the question of the requisite length of residence in the United States, or is that question open to inquiry collaterally? The proceeding to obtain naturalization is clearly a judicial one. A hearing is required to be had in open court, and the right can be conferred only by the judgment of the court, and upon satisfactory proof. It, therefore, has all the elements of a judgment. That it has the character and attributes of a judgment, and is equally conclusive, the authorities are entirely uniform. See Spratt v. Spratt, 4 Pet. [29 U. S.] 393, 407; McCarthy v. Marsh, 5 N. Y. 263, 279, 284, and authorities cited; In re An Alien, 7 Hill, (N. Y.) 137, 138; In re Clark, 18 Barb. 444; Ritchie v. Putnam, 13 Wend. 524–526.

The question of the requisite length of residence of the applicant is a question of fact, and, as appears by the record, was directly before the court and acted upon. Proofs were taken, and the court made a decision upon them. This court is now asked to decide that the superior court of the city of Chicago, before which the naturalization proceedings were had, erred in deciding as it did, or, in other words, that the fact in question is not as there found. It does not appear what the particular proofs or statements of the witnesses before the naturalizing court were, but, whatever they were, they were satisfactory to that court. Neither does it appear by the proofs in this court that the testimony here adduced to show that the fact of residence was not as there found, or was not before that court. But concede, as was probably the case, that it was not, then it comes here in the nature of newly discovered evidence, and this court is asked to allow it to impeach the naturalization, and as to a fact, too, which was directly before and acted upon by the naturalizing court. This is contrary to all precedent and all authority. To allow it would tend to unsettle the sanctity of the final adjudication of judicial tribunals, and render them of no more binding or conclusive effect than a simple contract. The question here is, not whether the particular evidence here adduced was or was not before the naturalizing court, but was the fact which this evidence is intended to prove or disprove before that court. The proofs in this case do not raise the question of fraud or collusion in the naturalization proceedings, but simply the question of fact as to the requisite length of residence of the claimant in the United States, before he was admitted to citizenship. Many authorities may be found (although they are by no means uniform), holding that a judgment may be impeached for fraud or collusion; but the court has not been referred to a single case, neither can one be found, in which it has been held that a judgment may be impeached for any matter which was necessarily before the court and involved in the decision, as the fact of residence was in the case under consideration. On the contrary, the authorities are uniform, that a judgment cannot be impeached for any such matter.

The distinction between cases in which judgments may and those in which they may not be impeached collaterally, as derived from the authorities, and founded in common sense, may be stated thus: They may be impeached by facts involving fraud or collusion, but which were not before the court or involved in the issue or matter upon which the judgment was rendered. They may not be impeached for any facts, whether involving fraud or collusion or not, or even perjury, which were necessarily before the court and passed upon.

See McCarthy v. Marsh, 5 N. Y. 284; Mason v. Messenger, 17 Iowa, 261, 272; White v. Merritt, 7 N. Y. 352, 355; Sidensparker v. Sidensparker, 52 Me. 481, 489; Parkhurst v. Sumner, 23 Vt. 538; Lewis v. Rogers, 16 Pa. St. 18, 21; Warburton v. Aken, [Case No. 17,143;] Demerit v. Lyford, 7 Fost. (N. H.) 541, 546–549; Dilling v. Murray, 6 Ind. 324; Peck v. Woodbridge, 3 Day, 30, 36; Homer v. Fish, 1 Pick. 435, 439–441; Smith v. Lewis, 3 Johns. 157, 168; Smith v. Lowry, 1 Johns. Ch. 322–324.

It was objected on the argument on be-

half of the United States, that the record shows that the oath of the applicant was allowed to prove his residence, contrary to the express provision of the naturalization laws, and that the record is therefore a nullity. The record states as follows: "And it appearing to the satisfaction of the court, as well from the oath of the said applicant as from the testimony of Charles Old and Jesse Coe," and then follows a statement of all the prerequisites to naturalization, viz.: residence, good moral character, attachment to the principles of the constitution, &c. The oath of the applicant is prohibited by the act only as to his residence. By implication, therefore, such oath may be allowed to prove any of the prerequisites other than that of residence; and this court will, in support of the validity of this record, refer such oath to such prerequisites only as could be lawfully proven by it, and will presume that the finding of the court, as to the residence of the applicant, was based upon the other testimony mentioned in the record, and not upon the oath of the applicant. It is a well-settled rule that when a record, or other writing, admits of two constructions, one of which will give it force and validity, and the other of which will render it a nullity, the court will adopt the former. I hold, therefore, that the objection is not tenable.

It was suggested by the learned counsel for the United States that naturalization proceedings, as usually conducted, are virtually ex-parte, and with but little, if any, circumspection or attention on the part of the court before which they are had, and that the court is liable to be imposed upon by false testimony and otherwise; and that, therefore, the rule ought to be more liberal in allowing them to be impeached than in the case of ordinary judgments. There is undoubtedly some force in the suggestion, but a little reflection will show that the inconvenience and hardship which would inevitably result to individuals from its adoption, would be vastly greater than the slight inconvenience resulting occasionally to the government by adhering to the strict rule.

The government favors naturalization; and, owing to the liberality of its laws upon that subject, is no doubt liable to occasional imposition; but if every naturalized citizen must always be prepared with his proofs to maintain the grounds upon which he obtained his papers, in all courts and places in which they may be brought in question, the boon of citizenship which is so liberally bestowed would be barely worth possessing. No proof was adduced to sustain the second article of the libel, other than what has been already considered. The libel must be dismissed.

[From 12 Int. Rev. Rec. 113:] I am authorized by Judge Withey, of the western district, before whom the case of The Advance [Case No. 14,425] is pending, to state that he concurs with me in the above result.