## GRAHAM *v.* RAILROAD COMPANY.

1. Where a corporation, solvent at the time, and having no actual intent to defraud creditors, disposes of its lands for an inadequate consideration or by a voluntary conveyance, its subsequent creditors cannot question the transaction.
2. *Semble,* that where a corporation has waived, or omitted to exercise, the right to institute proceedings to recover lands of which it has been defrauded, such right does not inure to the benefit of subsequent creditors or purchasers.

APPEAL from the Circuit Court of the United States for the Eastern District of Wisconsin.

This is a bill in equity filed by Lawrence G. Graham and Donald D. Scott against the La Crosse and Milwaukee Railroad Company, the Milwaukee and St. Paul Railway Company, Moses Kneeland, James Ludington, Byron Kilbourn, and others, to subject certain real estate in the city of Milwaukee, Wisconsin, to the satisfaction of certain judgments recovered by the complainants against the first-named company for an indebtedness on contracts arising after its sale and conveyance of that real estate, to Charles D. Nash. The defendants deraign title through him.

The court below dismissed the bill, whereupon the complainants appealed here. The remaining facts are stated in the opinion of the court.

*Mr. Matthew H. Carpenter* and *Mr. Newton S. Murphey* for the appellants.

The complainants had the right, as subsequent creditors, to maintain this suit, because, first, if, as we contend, the sale was void as to Nash and purchasers from him with notice, then subsequent creditors of the company may treat the conveyance to him as never having been made; and, secondly, if such sale is merely voidable, it may, at the suit of such creditors, be set aside and the property subjected to the payment of their debts.

It is a general principle that a creditor may, in equity, reach every property right of his debtor. *Williams* v. *Thorn*, 70 N. Y. 270. Even damages recovered for torts to property which is subject to execution may be reached by a creditor's bill. *Hudson* v. *Plets*, 11 Paige (N. Y.), 183. A creditor purchasing the lands of his debtor on execution may bring his bill to set aside a prior usurious mortgage, or prosecute any suit in regard to them that the debtor could have maintained. *Dix* v. *Van Wyck*, 2 Hill (N. Y.), 525; *Shaw* v. *Dwight*, 27 N. Y. 245; *McMahon* v. *Allen*, 35 id. 403. A judgment creditor may, without issuing an execution, maintain a suit to remove a cloud upon the title to lands, whereon his judgment would otherwise be a lien. *Shaw* v. *Dwight, supra.*

Where A. is induced by fraud to convey lands to B. under circumstances which, in equity, entitle the former to set aside the sale, B. has thereunder no such adverse possession as will defeat a subsequent deed from A. to C., and the latter may maintain a bill to set aside the prior voidable conveyance. *Livingston* v. *Iron Company*, 9 Wend. (N. Y.) 511; *Dickinson* v. *Burrell*, Law Rep. 1 Eq. 337; *McMahon* v. *Allen, supra; Baker* v. *Whiting*, 3 Sumn. 475.

*Crocker* v. *Belangee et al.* (6 Wis. 645), and *Milwaukee & Minnesota Railroad Co.* v. *Milwaukee & Western Railroad Co.* (20 id. 174), relied upon by the appellees, rest upon *Prosser* v. *Edmonds* (1 Y. & C. 481), which was substantially overruled by *Dickinson* v. *Burrell, supra.* These cases are both consid-

ered, and *Dickinson* v. *Burrell* is followed in *McMahon* v. *Allen*, which is very like the present case. The conveyance was obtained by fraud, and in violation of the duty imposed by fiduciary relations. The grantor then made a general assignment for the benefit of creditors; and the assignee's bill to set aside the conveyance was sustained.

Again, *Prosser* v. *Edmonds* and the cases following it, even if held to be good law, do not apply to this case. They all proceed upon the ground that the second conveyance is void by reason of the first grantee's adverse possession of the lands. This cannot be said of a proceeding by a creditor seeking, as in the present case, to enforce the lien of his judgment on them.

The doctrine that subsequent creditors cannot set aside a debtor's fraudulent conveyance rests upon the ground that he was a party to the fraud, and, in furtherance of it, transferred the property. He cannot rescind the sale; and they find no property right in him which even he could assert against his grantee. Existing creditors only are protected by the statute in such a case. But where the conveyance was obtained by fraud practised upon him, he has a subsisting property right, and may enforce the rescission of the sale.

If the defrauded debtor company had sold the property for value to the complainants, or conveyed it to them in satisfaction of their judgment, they could, in either case, have brought their bill to set aside the prior conveyance to Nash. If so, they could levy on the property, and, having thus acquired a specific lien, maintain such a suit.

The distinction between prior and subsequent creditors is not to be held as strictly in the case of a corporation as in that of individual debtors.

In *Bradwell* v. *Weeks* (1 Johns. (N. Y.) Ch. 205), and in *Cumberland* v. *Codrington* (3 id. 229), approved in *Bank of the Metropolis* v. *Guttschlick* (14 Pet. 19), it was held that when a trust is created for the benefit of a third party, though without his knowledge at the time, he may ratify and enforce it. In *Railroad Company* v. *Howard* (7 Wall. 392), and numerous subsequent cases, it is held that the property of a corporation is a trust fund for creditors; and we think the court

meant all creditors becoming such during the life of the corporation. *Jackson* v. *Ludeling*, 21 id. 616.

*Mr. Ephraim Mariner* and *Mr. John W. Cary*, contra.

MR. JUSTICE BRADLEY delivered the opinion of the court.

In September, 1855, the La Crosse and Milwaukee Railroad Company not being at that time, so far as appears, indebted in any considerable amount, sold certain lands in the city of Milwaukee not then wanted for railroad purposes to Charles D. Nash for the sum of $25,000. The officers of the company who took a leading part in negotiating the sale are charged to have been interested in the purchase, and to have furnished Nash the means for effecting it. At all events, shortly after it was made, Nash conveyed the property, for the original consideration, to Moses Kneeland, one of the officers referred to, and Kneeland, retaining one third part, subsequently conveyed the other two third parts to Ludington and Kilbourn, they all being directors of the company, and members of the executive committee. The company itself never questioned the fairness of this transaction; on the contrary, the sale was subsequently (in March, 1858) expressly confirmed by the board of directors, and a further quitclaim deed executed by the company in confirmation thereof. In September and November, 1858, the appellants recovered two judgments against the company for indebtedness on contract, arising after the sale of the lands, and issued executions thereon, under which levies were made on said lands, as lands of the company. In January, 1860, the appellants, having sued on these judgments in the United States court, recovered a second judgment for upwards of $40,000, issued execution thereon, and made another levy on the lands. Being unwilling to attempt a sale under their said execution in consequence of the deeds for the lands being recorded, the appellants, in June, 1860, filed the bill in this case against Kneeland, Kilbourn, Ludington, and the railroad company, setting forth their said judgments, executions, and levies, stating the fact of the said sale to Nash and his conveyance to Kneeland, and the latter's conveyance to the other parties; alleging that the transaction was a fraud against the corporation and its creditors, and complaining that the said

conveyances of the lands were a cloud upon their right to sell the lands under execution, and an impediment in the way of the execution of their writ of *fieri facias;* and prayed that the lands might be decreed subject to the lien of their judgment; that they might be decreed to be authorized to sell the same, or so much as might be necessary for the purpose of satisfying their judgment; and that Kneeland, Kilbourn, and Ludington might join in the conveyance, and might be restrained from claiming the land; and that the conveyances to them might be declared null and void. The bill, amongst other things, averred that the lands were sold to Nash for much less than their real value; but it contained no allegation that the company was insolvent, or that it had not other assets available under an execution; nor was any offer made to repay the consideration which the purchaser had given for the lands.

To this bill the defendants severally filed answers, denying that the lands were worth more than $25,000 at the time of sale; averring that the sale was made in good faith, and with the company's concurrence, and setting forth in detail many circumstances tending to show that the title was involved and embarrassed; that they required large outlays of money to render them available; that the company had offered them for sale in the market, and was unable to get from any other person the price paid for them by Nash; that although Nash was requested to purchase the lands by Kneeland, and was aided by him in paying therefor, yet Nash had the option to keep them; but after making the purchase and inquiring into the title and situation of the lands, he asked to be relieved from the purchase, and that thereupon Kneeland, Kilbourn, and Ludington took them off of his hands.

The parties went into proofs, and it appears that the company had, for months prior to the sale, been endeavoring to dispose of the lands, and could get no purchaser at the price offered by Nash; and the leading statements of the answer, as to the title and situation of the lands, were verified. It also appeared that the railroad company never objected to the sale, but that it was expressly confirmed in March, 1858, by a resolution of the board of directors, as before noticed.

Various transactions subsequently took place, by which other

parties became interested in the lands, and in the affairs and property of the railroad company, which are fully developed in the supplemental proceedings and proofs; but it is unnecessary to notice them further. The foregoing statement exhibits the leading features of the case as presented for our consideration.

The main question is, whether the sale to Nash, made before the railroad company became indebted to the appellants, and when for all that appears it was perfectly solvent, even though made for the use and benefit of the officers referred to, can be set aside at the instance of the complainants, for the purpose of subjecting the lands to sale under their execution. And this question, we think, must be answered in the negative.

It is a well-settled rule of law that if an individual, being solvent at the time, without any actual intent to defraud creditors, disposes of property, for an inadequate consideration, or even makes a voluntary conveyance of it, subsequent creditors cannot question the transaction. They are not injured. They gave credit to the debtor in the status which he had after the voluntary conveyance was made.

The authorities on this subject are fully collected in the notes to *Sexton* v. *Wheaton* (1 Am. L. Cas. 1), and in the opinion of Mr. Chief Justice Marshall in that case; and the general doctrine is affirmed in *Mattingly* v. *Nye*, 8 Wall. 370.

It is true that if a debtor dispose of his property, with intent to defraud those to whom he expects to become immediately or soon indebted, this may be a fraud against them, which they may have a right to unravel. But that is a special case, to which the present bears no resemblance. It is not pretended that the railroad company disposed of the property in question for the purpose of defrauding creditors, much less for the purpose of defrauding those who afterwards in due course of business might become its creditors.

But it is contended that this is a case in which the debtor corporation was defrauded of its property, and that as the company had a right of proceeding for its recovery, any of its judgment and execution creditors have an equal right; that it is a property right, and one that inures to the benefit of creditors.

Conceding that creditors who were such when the fraudulent procurement of the debtor's property occurred, — and cases to that effect have been cited, — the question still remains, whether, the debtor being unwilling to disturb the transaction, subsequent creditors have such an interest that they can reach the property for the satisfaction of their debts. We doubt whether any case, going as far as this, can be found. No such case has been cited in the argument. Dicta of judges to that effect may undoubtedly be produced, but they are not supported by the facts of the cases under consideration.

It seems clear that subsequent creditors have no better right than subsequent purchasers, to question a previous transaction in which the debtor's property was obtained from him by fraud, which he has acquiesced in, and which he has manifested no desire to disturb. Yet, in such a case, subsequent purchasers have no such right. In *French* v. *Shotwell* (5 Johns. (N. Y.) Ch. 555), Chancellor Kent decided, upon full consideration, that when a party to a judgment, entered upon a warrant of attorney, voluntarily waives his defence or remedy on the ground of fraud or usury, and releases the other party, a subsequent purchaser under him, with notice of the judgment, will not be allowed to impeach it, or to investigate the merits of the original transaction between the original parties ; and he dismissed a bill filed by the subsequent purchaser for relief in such a case. The Chancellor said : " If the party himself who is the victim of fraud or usury chooses to waive his remedy and release the party, it does not belong to a subsequent purchaser under him to recall and assume the remedy for him. If a judgment was fraudulent by collusion between the parties to it, on purpose to defraud a subsequent purchaser, the case would present a very different question. But if the judgment was fraudulent only as between the parties, it is for the injured party alone to apply the remedy. If he chooses to waive it and discharge the party, it cannot consist in justice or sound policy, that a subsequent voluntary purchaser, knowing of that judgment, should be competent to investigate the merits of the original transaction as between the original parties. *Quisque potest renunciare jure pro se introducto.* . . . It is stated to have been a principle of the common law that a fraud could only be

avoided by him who had a prior interest in the estate affected by the fraud, and not by him who subsequently to the fraud acquired an interest in the estate. *Upton* v. *Basset*, Cro. Eliz. 445, and recognized in 3 Co. 83 *a.*"

This decision of Chancellor Kent was afterwards nearly unanimously affirmed by the Court of Errors. 20 Johns. (N. Y.) 668.

When the question of the right of a creditor to set aside a conveyance procured from the debtor by fraud first came before the courts in England, it was held that the debtor's own right was merely the right to file a bill in equity against the fraudulent grantee adversely; and, if he did not see fit to take such a proceeding, his creditor had no such privity with the transaction as to enable him to obtain relief, even though the debtor should assign his supposed right to the creditor; that the transaction savored of champerty, and was opposed, at least, to the spirit of the law against champerty and maintenance. This was the substance of the decision by the Court of Exchequer in 1835, in *Prosser* v. *Edmonds*, 1 Y. & C. 481. Lord Abinger treated the case as a new one, and at the close of the argument remarked that his impression was that such a claim could not be sustained in equity, unless the party who made the assignment joined in the prayer to set it aside. He afterwards gave a deliberate opinion upon the point. In that case, an executor and trustee had fraudulently procured an assignment of his brother-in-law's interest in the estate, knowing its value, which was unknown to the assignor. A subsequent creditor of the assignor, to whom he assigned his whole interest in the estate, filed a bill to set aside the assignment to the trustee. Lord Abinger distinguished the case from that of an assignment of a chose in action, as a note not negotiable, or a bond, or a mortgage, or an equity of redemption, where possession of the thing assigned is delivered to the assignee; and treated it as an assignment of a mere naked right to file a bill in equity, in which the last assignee purchased nothing but a hostile right to bring parties into a court of equity as defendants to a bill filed for the purpose of obtaining the fruits of his purchase. " What is this," says the Lord Chief Baron, " but the purchase of a mere right to recover? It is a rule, not of our law alone, but of that of all countries (Voet ad Pandect,

Lib. 41, tit. 1, sect. 38), that the mere right of purchase shall not give a man a right to legal remedies. The contrary doctrine is nowhere tolerated, and is against good policy. All our cases of maintenance and champerty are founded on the principle that no encouragement should be given to litigation by the introduction of parties to enforce those rights which others are not disposed to enforce. There are many cases where the acts charged may not amount properly to maintenance or champerty, yet of which, upon general principles, and by analogy to such acts, a court of equity will discourage the practice." "Robert Todd, when he assigned, was in possession of nothing but a mere naked right. He could obtain nothing without filing a bill. No case can be found which decides that such a right can be the subject of assignment, either at law or in equity." These remarks are very broad, and would apply to the case of existing as well as subsequent creditors; though the case itself was that of a subsequent creditor. It forms the subject of a section in Story's Commentaries on Equity (sect. 1040 h), where, in a note, Lord Abinger's opinion is extensively quoted; and it has been followed by other very respectable authorities, and, as applied to subsequent creditors, at least, we think that the reasoning is sound.

The principle established in *Prosser* v. *Edmonds* has been adopted by the Supreme Court of Wisconsin, in which State the lands in question are situated. In *Crocker* v. *Belangee et al.* (6 Wis. 645), decided in 1858, it was held that a deed obtained from the grantor, through fraudulent representations made by the grantee, is not void, but voidable only, at the election of the grantor : and that the conveyance of the same land by the grantor to another person is not the exercise of such election, and does not avoid the former deed ; that, in order to avoid such former deed, some proceeding must be had by the grantor to which the grantee is a party ; and that a subsequent purchaser from the grantor cannot set up the alleged fraud of the first grantee to defeat his title, — the court holding that the right of a vendor to avoid a sale or deed on the ground of fraud practised by the vendee is not a right or interest capable of sale and transfer, so as to enable a subsequent vendee of such right, for such cause, to attack the title

of the first vendee; that it is a mere personal right, incapable of sale or transfer.

In *Milwaukee & Minnesota Railroad Co.* v. *Milwaukee & Western Railroad Co.* (20 id. 174), the latter company had covenanted to pay a certain portion of an incumbrance on railroad property afterwards purchased by the complainant company under a subsequent mortgage. A release of the obligation had been fraudulently, as alleged, procured from the original mortgagor company owning the road. The complainant purchased under a mortgage which conveyed " all causes of action, demands, and choses in action, of whatever nature," of the mortgagors; and claimed to have purchased the right to set aside the alleged fraudulent release, and filed a bill for that purpose; but the bill was dismissed on the ground that such a right of action could not be thus assigned. The court say: " Admitting that the facts alleged present a case which would entitle the La Crosse and Milwaukee company [the mortgagor] to have the release set aside on account of these acts of fraudulent concealment by one of its directors of his interest in the defendant company, and assuming that the further fact appears that this right of action has been assigned by the La Crosse and Milwaukee company to the plaintiff, the question would then arise, whether the release could be avoided on the application of such plaintiff, the La Crosse and Milwaukee company making no complaint of the fraud whatever. In other words, is this mere right to litigate the question, and to set aside the deed of release on account of fraud practised upon the assignor, a subject of assignment and transfer, and will a court of equity allow the assignee to stand in the shoes of the assignor in respect to the remedies?" And then referring to the previous case of *Crocker* v. *Bellangee et al.*, and to *Prosser* v. *Edmonds*, the court expresses its approbation of those decisions, and adds: " A reference to these authorities is all which probably need be said at this time in regard to the allegations above cited [referring to the contention of counsel]; and upon the point whether the plaintiff company could avoid the release for the alleged fraudulent act of concealment, even if this right of action had been assigned to it by the La Crosse and Milwaukee company."

It seems to us that those cases, which, so far as it appears, declare the settled law of Wisconsin, are conclusive of the present case.

It is contended on the part of the appellants that *Prosser* v. *Edmonds* has been overruled by the subsequent cases of *Dickinson* v. *Burrell* (Law Rep. 1 Eq. 337) and *McMahon* v. *Allen*, 35 N. Y. 403. We have examined these cases, and others which are supposed to be in conflict with *Prosser* v. *Edmonds*. In *Dickinson* v. *Burrell*, the Master of the Rolls, Lord Romilly, expressly disavows any intention to overrule the former case. He says: " The demurrer is mainly supported on the case of *Prosser* v. *Edmonds*, which was decided, after long deliberation, by Lord Abinger ; but I am of opinion that the case before me does not fall within the rule established by that decision." The case then before the court was, that a convey- ance of an interest in an estate had been fraudulently procured from Dickinson, by his own solicitor, to a third party for the solicitor's benefit, and for a very inadequate consideration. Dickinson, ascertaining the fraud, by a conveyance which re- cited the facts, and that he disputed the validity of the first conveyance, transferred all his share in the estate to trustees for the benefit of himself and his children. The trustees filed a bill to set aside the fraudulent conveyance upon repayment of the consideration-money and interest, and to establish the trust. The Master of the Rolls sustained the bill, observing: " The distinction is this : if James Dickinson had sold or conveyed the right to sue to set aside the indenture of December, 1860, without conveying the property, or his interest in the property, which is the subject of that indenture, that would not have enabled the grantee, A. B., to maintain this bill ; but if A. B. had bought the whole interest of James Dickinson in the property, then it would. The right of suit is a right incidental to the property conveyed." " I think that the distinction between the convey- ance of the property itself and the conveyance of a mere right to sue, or what in substance is a right to sue, is taken by Lord Abinger in the case of *Prosser* v. *Edmonds*. The distinction is also taken in *Cockell* v. *Taylor* (15 Beav. 103) and in *Ander- son* v. *Radcliffe* (Ell., B. & E. 806), and has been adopted and approved in many other cases ; and it is, I think, founded in reason and good sense."

Surely there is here no overruling of *Prosser* v. *Edmonds*, even if such overruling could avail against the Wisconsin decisions. It leaves that case in full force as to assignments of the mere right to sue. In the case before us there is not even that. The railroad corporation acquiesced in the sale, and confirmed it. The conveyance, which, perhaps, might have been set aside had the company seen fit, became absolute as between the parties and carried the title. It is as valid between the parties as if the corporation had conveyed to a stranger. The appellant then becomes a creditor, and afterwards obtains judgment, and simply makes a levy; and then comes into court and asks its aid to remove a cloud from its title. What title? Has he acquired any title? Was there any title for him to acquire? There had been a right to file a bill in equity, and that right had been remitted by the company's acquiescence in the sale,— probably for the reason that it obtained all that the property was worth at the time. The contrary, at least, is not established. And if it were established, it would only make out a case of voluntary conveyance as against a subsequent creditor, which has already been considered. We think that there is nothing in the case of *Dickinson* v. *Burrell* to overrule the effect of *Prosser* v. *Edmonds*, so far as the present case is concerned.

Then, as to *McMahon* v. *Allen* (35 N. Y. 403), decided in 1866. One Harrison, in March, 1852, being in debt, was induced by the fraudulent contrivance of his agent and attorney, and to the prejudice of his creditors, to convey to said agent, for a very inadequate consideration, his interest in his mother's estate and in certain other property, he being ignorant of the fraud practised upon him. In August, 1852, Harrison made a general assignment for the benefit of his creditors of all his property and rights of action, with full power to sue for and collect the same. The assignee filed a bill to set aside the conveyance to the agent. The bill was sustained. The court, Mr. Justice Hunt delivering the opinion, relied on *Dickinson* v. *Burrell*, saying: "In the recent case of *Dickinson* v. *Burrell*, this precise question was presented;" and, after quoting largely from the opinion in that case, added: "This was a well-considered case, is of high authority, and, in

my opinion, is an accurate exposition of the law. I think it should control the present case." In the New York case, it is true, there was no express repudiation of the fraudulent conveyance, as in *Dickinson* v. *Burrell*, but there was a conveyance of the estate to the assignee, with a power to sue for the benefit of creditors; and those creditors had been directly defrauded. Without further comment, it seems to us clear that *McMahon* v. *Allen* cannot control the present case.

The principle that subsequent creditors cannot question a voluntary or fraudulent disposition of property by their debtor, not intended as a fraud against them, is especially applicable in cases of constructive fraud, like that charged in the present bill. Suppose it be true that the purchase of the lands in question by or for the benefit of officers of the company actively concerned in the transaction could be set aside at the instance of the company as a constructive fraud, yet if there was no actual fraud, if the company received full consideration for the property sold, how can it be said that subsequent creditors of the company are injured?

In the present case we are satisfied from the evidence that the property was sold for its fair value at the time, and that no actual loss accrued to the railroad company's estate.

It would be unjust and a great hardship, therefore, on the mere ground of the constructive fraud, to allow creditors who had no interest at the time to seize and dispose of the property sold.

It is contended, however, by the appellant that a corporation debtor does not stand on the same footing as an individual debtor; that, whilst the latter has supreme dominion over his own property, a corporation is a mere trustee, holding its property for the benefit of its stockholders and creditors; and that if it fail to pursue its rights against third persons, whether arising out of fraud or otherwise, it is a breach of trust, and creditors may come into equity to compel an enforcement of the corporate duty. This, as we understand, is the substance of the position taken.

We do not concur in this view. It is at war with the notions which we derive from the English law with regard to the nature of corporate bodies. A corporation is a distinct entity.

Its affairs are necessarily managed by officers and agents, it is true; but, in law, it is as distinct a being as an individual is, and is entitled to hold property (if not contrary to its charter) as absolutely as an individual can hold it. Its estate is the same, its interest is the same, its possession. is the same. Its stockholders may call the officers to account, and may prevent any malversation of funds, or fraudulent disposal of property on their part. But that is done in the exercise of their corporate rights, not adverse to the corporate interests, but coincident with them.

When a corporation becomes insolvent, it is so far civilly dead, that its property may be administered as a trust-fund for the benefit of its stockholders and creditors. A court of equity, at the instance of the proper parties, will then make those funds trust-funds, which, in other circumstances, are as much the absolute property of the corporation, as any man's property is his. We see no reason why the disposal by a corporation of any of its property should be questioned by subsequent creditors of the corporation, any more than a like disposal by an individual of his property should be so. The same principles of law apply to each.

We think that the present bill cannot be maintained.

*Decree affirmed.*